# Dempsey v. Cassady.

### (Decided Oct. 24, 1933.)

J. SNEED YAGER and EDWARD L. ALLEN for appellant.

W. D. O'NEAL and W. T. CAIN for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

'As rival candidates for the Republican nomination for the office of county court clerk of Martin county, Rush Cassady received 1,098 votes, Dan Harmon 760 votes, and L. A. Dempsey 665 votes. After duly canvassing and tabulating the votes, the election commissioners issued a certificate of nomination to Cassady.

Thereafter, and within the time prescribed by law, L. A. Dempsey instituted this action contesting the nomination of Cassady, alleging in the petition that contestee procured his certificate of nomination and the apparent majority of votes entitling him thereto by fraud and corruption and by spending of money for the purpose of bribing and influencing voters; that he expended large sums of money in excess of $1,000 but in amounts unknown to contestant, which were used by himself, his friends, workers, and supporters in bribing and influencing voters to vote for him, all of which was done with the knowledge, acquiescence, and procurement of contestee and in violation of section 1565b-11, Kentucky Statutes, known as the Corrupt Practice Act; that contestee violated the provisions of section 1565b-6 of the statute, in that the post-election expense account filed by him, purporting to show the sums of money disbursed or expended in his campaign, failed to correctly set up the sums expended by him in securing his nomination. It was further alleged that Dan Harmon corruptly expended large sums of money for the purpose of bribing voters to vote for him. He asked that the certificate of nomination awarded contestee Cassady be held void and of no effect; that he be adjudged to have received the highest number of legal votes; and that he be awarded the certificate of nomination.

By separate answer, contestee, Cassady, controverted the allegations of the petition and as counter grounds of contest alleged that contestant violated the Corrupt Practice Act by the use of money to corrupt or bribe voters to cast their votes for him.

Dan Harmon by separate answer traversed the allegations of so much of the petition as charged him with violating the Corrupt Practice Act.

On proper certification that the regular judge of Martin circuit court was disqualified or unable to sit at the trial of the case, Hon. J. B. Hannan was designated to preside in his stead.

At the close of the evidence which was heard orally, the chancellor held that contestant failed to sustain either of the causes of action set up in his petition against contestee, Rush Cassady, and entered judgment dismissing the petition, and holding contestee to be the legally nominated Republican candidate for county court clerk.

Evidently contestant had very little positive information as to corrupt or improper expenditure of money by contestee, since a great number of witnesses were called in the apparent hope of developing something to sustain the allegations of his petition. After something over twenty witnesses were called, it was merely shown that contestee had given $4 to one man to ride over a precinct and correct a report being circulated that he had withdrawn from the race; that he paid another man $2 for two nights' lodging and meals; that he paid another $10 for a horse to ride for seventeen days during the campaign; that he gave to various persons sums ranging from $1 to $10 or $15 to hire automobiles to bring voters to the polls. It was further shown that relatives and friends had also given money to various persons to hire automobiles for the purpose of getting out the vote, but none of this evidence tends to show any corrupt expenditure or knowledge of such expenditure of money in behalf of contestee.

Finally, Mrs. Charity Carter, her husband, their two sons, and a number of other voters from a settlement or community known as Black Log were called as witnesses. According to their evidence, Jasper Preece, John Fletcher, Jim Horn, and James Hardin and others were in offices at the courthouse making out tickets and paying money to floating voters. Mrs. Carter stated that she was given a slip of paper containing the names of various candidates and that she was paid $2.50 for her vote by Preece; that contestee contributed 50 cents to this sum. One other witness testified that after she was furnished a list and had voted, contestee gave her 50 cents. Others testified to having received money for their votes, and the evidence of some indicates that contestee was present. The greater number of these witnesses testified, however, that they did not see contestee in the offices or contributing to the sums being paid to voters.

Contestee testified that at one time he passed through the room or by the door where Preece and others were working with voters; that Preece asked him if he wanted to chip in to buy some votes, but that he informed Preece that he had no money and did not care to participate in the vote buying; that Preece handed him a $5 bill and asked him to procure change for it; that he went across the street to a restaurant, got the change, returned to the courthouse, and gave it to Preece, but that he gave him no other money. In this he was fully corroborated by Preece. The evidence of Charity Carter was impeached by a number of witnesses who stated that her reputation for truth and veracity was bad.

It will be seen from the foregoing that the only direct evidence that contestee paid money to bribe or influence a voter or voters to vote for him is that of Charity Carter. In view of the fact that she was impeached by a number of witnesses, and many of the voters from Black Log who were with her in the room at the time failed to corrborate her as to the presence of contestee, we are forced to conclude, as no doubt did the chancellor, that her evidence was entitled to little, if any, credence. On the other hand, the evidence of contestee, Preece, and others, and the proven facts and circumstances, tend to establish that contestee did not, himself or through others, engage in buying votes.

While the finding of a chancellor is not given the same effect in a court of review as is the verdict of the jury, it is entitled to consideration and weight, and especially is this true where, as in this instance, the evidence is heard in open court and the chancellor is thereby afforded the opportunity of observing the witnesses while testifying.

Unless it appears that the judgment of the chancellor is not in accord with the weight of evidence or if, on consideration of the record, the mind is left in doubt as to the correctness of the chancellor's finding, it will not be disturbed on appeal. Treadway v. Lehman, 212 Ky. 605, 279 S. W. 983; Lewis v. Williams, 192 Ky. 763, 234 S. W. 317; Johnston v. Williams, 187 Ky. 764, 220 S. W. 1057; Hoge v. Kentucky River Coal Corporation, 216 Ky. 51, 287 S. W. 226; Childers v. Groves, 194 Ky. 790, 240 S. W. 1057.

Manifestly the judgment finds substantial support in the evidence and if, in fact, it is not in accord with the preponderating weight of evidence, it at least leaves such doubt as would prevent this court disturbing the chancellor's finding.

Contestee's pre-election expense account shows a total expenditure of $58 and his post-election expense account shows a total of $181. It is insisted by counsel for contestant that the post-election expense account is at variance with proof as to expenditures made by contestee, in that it does not correctly itemize amounts and persons to whom they were paid. There is one item of $75 expended by contestee in getting out the vote. He explains in his evidence that he had given money to various persons for automobile hire and could not remember the various persons or the amount paid them but made this amount large enough to cover all such expenditures. While the expense account in question does not conform to the technical requirements of the statute, there is nothing in the record to indicate evasion, corruption, or intentional violation of the law by contestee. In the proven facts and circumstances it is apparent that there was a substantial compliance with the provisions of the statute (section 1565b-6) upon part of contestee with respect to the filing of the expense account.

Judgment affirmed.